# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

RONALD A. McIVER,
            *Defendant-Appellant,*

            and

ALL OUT BAIL BONDING; GIGGIES
BONDING COMPANY,
            *Parties in Interest.*

No. 05-4884

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
Henry F. Floyd, District Judge.
(CR-04-745)

Argued: September 21, 2006

Decided: December 5, 2006

Before WILKINSON and DUNCAN, Circuit Judges, and
Richard L. VOORHEES, United States District Judge
for the Western District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion, in
which Judge Wilkinson and Judge Voorhees concurred.

## COUNSEL

**ARGUED:** John Philip Flannery, II, CAMPBELL, MILLER & ZIM-
MERMAN, P.C., Leesburg, Virginia, for Appellant. William Corley

Lucius, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee. **ON BRIEF:** Eli D. Stutsman, Portland, Oregon; C. Rauch Wise, Greenwood, South Carolina, for Appellant. Jonathan S. Gasser, United States Attorney, Columbia, South Carolina, for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

The field of pain management has generated controversy because of its reliance on opiate-based pain medications (opioids), which are also a target of the government's war on drugs. *See* Diane E. Hoffmann & Anita J. Tarzian, Achieving the Right Balance in Oversight of Physician Opioid Prescribing for Pain: The Role of State Medical Boards, 31 J. L. Med. & Ethics 21, 22-23 (2003). The government has recently become more aggressive in prosecuting doctors who unlawfully distribute opioids and other prescription drugs under the guise of legitimate medical practice. *See United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006); *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006); *United States v. Williams*, 445 F.3d 1302 (11th Cir. 2006); *United States v. Alerre*, 430 F.3d 681 (4th Cir. 2005). The charges against Dr. Ronald A. McIver ("Appellant") arose from his prescription of pain medications to patients at a pain clinic. He appeals his conviction for various counts of unlawful distribution of a controlled substance, unlawful distribution of a controlled substance resulting in death, and conspiracy to unlawfully distribute a controlled substance. For the reasons that follow, we affirm.

I.

Appellant is a doctor of osteopathic medicine[1] who was licensed to

---

[1]"A doctor of osteopathic medicine (D.O.) is a physician licensed to perform surgery and prescribe medication." MedlinePlus Medical Encyclopedia: Doctor of Osteopathy (D.O.), http://www.nlm.nih.gov/medlineplus/ency/article/002020.htm. Osteopaths differ from doctors of medicine ("M.D.") in that they receive specialized training in "hands-on manual medicine and the body's musculoskeletal system," and are "dedicated to treating and healing the entire patient as a whole, rather than focusing on one system or body part." *Id.* In practice, however, the roles of D.O.'s and M.D.'s are often identical.

prescribe controlled substances under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* He operated a medical clinic in Greenwood, South Carolina that specialized in treating chronic pain. The United States Drug Enforcement Administration ("DEA") began investigating Appellant in 2002 after receiving information about his prescribing practices from the Columbia, South Carolina police department. J.A. 682-83.[2] During its investigation, the DEA discovered that Appellant had prescribed massive quantities of oxycodone,[3] Dilaudid,[4] OxyContin,[5] methadone,[6] and morphine[7] to his patients. J.A. 687-88. The investigation also uncovered a disturbing pattern among Appellant's patients. These patients included admitted drug addicts who traveled significant distances to see him, appeared without referrals, paid in cash, and sought specific drugs which were prescribed for them based on little or no physical examination.

The government indicted Appellant on fifteen counts related to his treatment of ten patients, nine of whom testified for the government at trial. The remaining patient, Larry Shealy, was deceased; his death formed the basis of two counts of the indictment.

---

[2]Our citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[3]Oxycodone is a potent and addictive opioid that is classified as a Schedule II drug under the Controlled Substances Act. *See* 21 U.S.C. § 812 (2000); 21 C.F.R. § 1308.12(b)(1) (2004). It is marketed in instant-release form under trade names such as Roxicodone, Roxicet, OxyIR, and OxyFAST, and in a controlled- release form as OxyContin.

[4]Dilaudid is the trade name for a medication that contains hydromorphone, a potent and addictive opioid that is classified as a Schedule II narcotic. § 1308.12(b)(1).

[5]OxyContin is the trade name of a controlled-release form of oxycodone that can be crushed to circumvent the time-release mechanism and then taken either nasally or intravenously.

[6]Methadone is a potent and addictive synthetic opioid that is used to treat pain and addiction to other opioids. It is classified as a Schedule II narcotic. § 1308.12(b)(1).

[7]Morphine is one of the most powerful and addictive opioids. It is classified as a Schedule II narcotic. § 1308.12(b)(1).

After trial, the jury convicted Appellant of one count of conspiracy to distribute controlled substances unlawfully in violation of 21 U.S.C. § 846 (2000) (Count 1), six counts of unlawful distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) (2000) (Counts 3-5, 13-15), and two counts of unlawful distribution of a controlled substance resulting in the death of Larry Shealy in violation of § 841(a)(1) & (b)(1)(C) (Counts 11, 12).[8] The district court sentenced Appellant to 240 months on Counts 1, 3, 4, 5, 13, 14, and 15, and 360 months on Counts 11 and 12, to run concurrently. Appellant timely appealed.

We turn now to a consideration of the facts relevant to this appeal, beginning with those involving the six patients whose experiences underlie Appellant's convictions. In the context of Appellant's challenges to the sufficiency of the evidence, we recite those facts in the light most favorable to the government. *United States v. Rahman*, 83 F.3d 89, 93 (4th Cir. 1996). We then discuss the testimony of the government's expert witness, Dr. Steven Storick, and the district court's jury instruction on the § 841(a)(1) charges.

A.    Larry Shealy

Larry Shealy sought treatment from Appellant for back and knee pain. J.A. 416. Appellant treated Shealy almost exclusively with large quantities of various simultaneous combinations of morphine, Oxycontin, oxycodone, and methadone. J.A. 526. Shealy's son, who accompanied his father to many of his appointments, only observed his father receive non-drug therapy once. J.A. 416-17.

Shealy's son testified that after Shealy started seeing Appellant, his father's demeanor changed dramatically. J.A. 417-19. In addition to losing his appetite and weight, Shealy became somnolent and irritable. J.A. 418. On one occasion, Shealy backed his truck into a tree, apparently without realizing he had done so. J.A. 417-18. These changes so worried Shealy's son that he counseled his father to stop seeing Appellant. J.A. 419. Shealy, however, continued seeing Appellant until he died from an oxycodone overdose. J.A. 419-20, 427-30,

---

[8]McIver was acquitted of all charges relating to four patients, identified as "A," "E," "F," and "G" in the indictment. J.A. 15-20.

456. The level of drugs in Shealy's system when he died was consistent with the amounts Appellant prescribed. J.A. 427-30.

A representative of the company that provided Shealy health insurance testified that the amount and cost of the drugs prescribed to Shealy, along with the frequency of dosage, "was as high as [he had] ever seen." J.A. 134-35. The representative became so concerned about Shealy's prescriptions that he contacted the DEA. J.A. 134.

### B.   Barbee Brown

Barbee Brown sought treatment from Appellant primarily for reflex sympathetic dystrophy, a chronic neurological condition that causes severe pain. J.A. 518-19. Appellant knew from the outset that Brown had a history of prescription drug and cocaine abuse. J.A. 207-08, 519. He nevertheless prescribed OxyContin, oxycodone, and, later, methadone in various simultaneous combinations for her. J.A. 518-23. Appellant also allowed Brown to manage her own dosing without specifying a maximum amount. J.A. 208. Brown's father wrote to Appellant to express concern about his daughter's treatment, stating that, since coming to see Appellant, Brown had been in a "drug state," "unstable in her speech and ha[d] threatened to kill" her father. J.A. 233, 520. Appellant continued prescribing opioids to Brown, however, maintaining that, if anything, her dose was too low. J.A. 521.

Appellant stopped treating Brown abruptly after less than two months when her insurance stopped covering his care. J.A. 211. He took no steps to wean her from the opioids, however, and she was hospitalized for four days with severe drug withdrawal symptoms. J.A. 211-12.

### C.   Leslie Smith

Leslie Smith sought treatment from Appellant specifically to obtain prescription painkillers. J.A. 176. Smith traveled sixty miles each way to see Appellant after learning that he had readily prescribed drugs to one of Smith's friends. J.A. 175-76. Smith testified that he lied to Appellant about pain in his wrist, but that Appellant prescribed high doses of OxyContin and Dilaudid, the drugs that Smith requested,

without ordering x-rays. J.A. 178, 180-183. At trial, Smith admitted that he was a drug addict and injected these drugs to satisfy his habit. J.A. 176. Evidence indicates that Appellant was aware of Smith's drug use; Appellant discovered a syringe in Smith's possession during a visit, but on being told that Smith used it for fishing, continued to prescribe Smith's drugs. J.A. 185.

Appellant eventually became sufficiently suspicious that Smith was either using or selling his medications to write to the South Carolina Department of Health and Environmental Control to express those concerns. J.A. 180-81, 684. Appellant, however, continued prescribing drugs to Smith after writing the letter. J.A. 181-82.

### D.   Seth Boyer

Like Smith, Seth Boyer learned of Appellant from friends and began traveling more than an hour to see him specifically to obtain prescription drugs. J.A. 248, 250-51. Boyer came to his first appointment with Appellant with track marks on his arms from intravenous drug use. J.A. 250-51, 253. Boyer complained of pain in his foot, but, as with Smith, Appellant did not x-ray it before prescribing OxyContin, OxyFast, and Dilaudid. J.A. 249-50, 253. Boyer both used and sold these drugs. J.A. 253. On one occasion, Boyer lied to Appellant about spilling a bottle of liquid oxycodone, and Appellant refilled the prescription immediately. J.A. 255.

### E.   Kyle Barnes

Kyle Barnes started seeing Appellant for treatment of fibromyalgia, a chronic condition characterized by widespread pain and stiffness, after her former provider was closed by the government because of its prescribing practices. J.A. 347. When Appellant first began treating her, Barnes was addicted to oxycodone. J.A. 346. Even though Barnes was poor and receiving Medicaid, she traveled nearly three hours to see Appellant, paid for his services in cash and filled prescriptions for thousands of dollars worth of medications. J.A. 350, 353, 359, 530.

Appellant prescribed Barnes massive doses of methadone, Oxy-Contin, oxycodone and morphine in various simultaneous combina-

tions. J.A. 354, 356, 529. In one year, Appellant prescribed Barnes 20,562 individual doses of various medications. J.A. 687. Appellant continued to prescribe methadone even after Barnes told him that she could not take it because of side effects. J.A. 354, 356. Barnes sold both the methadone and morphine. J.A. 356, 359.

Evidence supports an inference that Appellant knew Barnes was not taking her medicine as prescribed. At one point after Appellant had prescribed Barnes high doses of opioids for a number of months, she reported running out of her medications. J.A. 530-31. She did not, however, report any of the withdrawal symptoms commonly associated with a sudden cessation of such high doses. J.A. 530-31.

### F.   Angela Knight

Angela Knight sought treatment from Appellant for chronic back pain after her previous pain clinic was shut down for its prescribing practices. J.A. 388-89. Even though she lived closer to other pain clinics, Knight traveled nearly two-and-one-half hours to see Appellant. J.A. 392, 542. He treated Knight with high doses of OxyContin, along with methadone and oxycodone. J.A. 538-40.

As with other of Appellant's patients, evidence suggested that Knight was not taking her medicine as prescribed. For example, at her former pain clinic, Knight twice tested negative for opioids despite being prescribed OxyContin at the time. J.A. 537-38. Even though her medical records revealed this fact, on her first visit to him, Appellant doubled the dosage of her previous OxyContin prescription. J.A. 390. Thereafter, Appellant continued to prescribe high and escalating doses of opioids for Knight after his office conducted two similar drug tests that detected no opioids in her system. J.A. 538, 542.

On other occasions, Knight tested positive for opioids, indicating that she was, in fact, taking her medications. J.A. 539-40. Knight eventually became addicted to the medications that Appellant prescribed and suffered significant withdrawal when she stopped taking them. J.A. 397.

### G.   Dr. Steven Storick's Testimony

At trial, the government offered testimony from Dr. Steven Storick ("Dr. Storick"), an anesthesiologist qualified as an expert in pain man-

agement. Based on his review of certain patient records, Dr. Storick concluded that the treatment of several of Appellant's patients fell outside the parameters of legitimate medical practice.

With respect to Shealy, for example, Dr. Storick testified that there was "no legitimate reason to be prescribing" combinations of opioids in such high doses based on the patient's medical conditions. J.A. 527. Similarly, given Brown's history of drug abuse, Storick testified that Appellant's treatment went "outside the course of legitimate medical practice," and was "like pouring gasoline onto a fire." J.A. 523.

As to Barnes, Dr. Storick stated that it was uncommon to treat fibromyalgia with the amount and type of medication Appellant prescribed. J.A. 533. Indeed, he testified that Appellant's treatment of her "was one of the worst cases [he had] seen" and that "it was way outside the course of legitimate medical treatment." J.A. 534. In response to questions about Ms. Knight, Dr. Storick testified that it was outside the legitimate practice of medicine for Appellant to prescribe high doses of opioids given her history of negative drug screens. J.A. 542-43.

Dr. Storick was subjected to rigorous cross-examination regarding varying theories of pain management, and acknowledged differences in points of view as to appropriate levels of pain medication. J.A. 576-80. He was also challenged as to, and defended his opinions regarding, Appellant's treatment of specific patients.

H.   Jury Instructions for § 841(a)(1) Charges

Under § 841(a)(1), the government must prove (1) that Appellant knowingly or intentionally distributed a controlled substance; (2) with knowledge that it was controlled under the law; and (3) that he did so "outside the usual course of professional practice." *United States v. Moore*, 423 U.S. 122, 124 (1975); *see also United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994) (setting out elements of § 841(a)(1) charge). With respect to the third element—the only one challenged by Appellant on appeal—the district court instructed the jury extensively prior to its deliberations.[9]

---

[9]The court instructed the jury in relevant part as follows:

  There are no specific guidelines concerning what is required

## II.

On appeal, Appellant argues that: (1) the district court's instructions on the § 841(a)(1) charges improperly lowered the government's

to support a conclusion that a defendant physician acted outside the usual course of professional practice and for other than a legitimate medical purpose. In making a medical judgment concerning the right treatment for an individual patient, physicians have discretion to choose among a wide range of options. Therefore, in determining whether a defendant acted without a legitimate medical purpose, you should examine all of a defendant's actions and the circumstances surrounding the same.

If a doctor dispenses a drug in good faith, in medically treating a patient, then the doctor has dispensed that drug for a legitimate medical purpose in the usual course of medical practice. That is, he has dispensed the drug lawfully.

Good faith in this context means good intentions, and the honest exercise of professional judgment as to the patient's needs. It means that the defendant acted in accordance with what he reasonably believed to be proper medical practice. If you find that a defendant acted in good faith in dispensing the drugs charged in this indictment, then you must find that defendant not guilty.

For you to find that the government has proven this essential element, you must determine that the government has proven beyond a reasonable doubt that the defendant was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or dispensing controlled substances for other than a legitimate medical purpose, in other words, the personal profit of the physician.

Put another way, the government must prove as to each count beyond a reasonable doubt that the defendant dispensed the specific controlled substance other than for a legitimate medical purpose and not with the bounds of professional medical practice.

A physician's own methods do not themselves establish what constitutes medical practice. In determining whether the defen-

burden of proof; (2) Dr. Storick's expert testimony constituted inadmissible legal opinions; (3) the district court erred in excluding evidence from Appellant's expert witness, Dr. Thomas Duc; and (4)

---

dant's conduct was within the bounds of professional practice, you should, subject to the instructions I give you concerning the credibility of experts and other witnesses, consider the testimony you have heard relating to what has been characterized during the trial as the norms of professional practice.

You should also consider the extent to which, if at all, any violation of professional norms you find to have been committed by the defendant interfered with his treatment of his patients and contributed to an over prescription and/or excessive dispensation of controlled substances. You should consider the defendant's actions as a whole and the circumstances surrounding them. A physician's conduct may constitute a violation of applicable professional regulations as well as applicable criminal statutes. However, a violation of a professional regulation does not in and of itself establish a violation of the criminal law. As I just indicated, in determining whether or not the defendant is guilty of the crimes with which he is charged, you should consider the totality of his actions and the circumstances surrounding them and the extent and severity of any violations of professional norms you find he committed. . . .

There has been some mention in this case from time to time of the standard of care. During the trial the words medical malpractice may have been used. Those words relate to civil actions. When you go to see a doctor, as a patient, that doctor must treat you in a way so as to meet the standard of care that physicians of similar training would have given you under the same or similar circumstances. And if they fall below that line or what a reasonable physician would have done, then they have not exercised that standard of care, which makes them negligent and which subjects themselves to suits for malpractice.

That is not what we're talking about. We're not talking about this physician acting better or worse than other physicians. We're talking about whether or not this physician prescribed a controlled substance outside the bounds of his professional medical practice.

J.A. 1291-96.

there was insufficient evidence to support each of his convictions. We consider each argument in turn.

## A.

### 1.

Appellant first argues that by referring to "norms of professional practice" in the jury instructions, the district court improperly allowed the jury to convict on a civil, rather than a criminal, standard of proof. We review the accuracy and adequacy of jury instructions de novo, *United States v. Scott*, 424 F.3d 431, 434 (4th Cir. 2005), and will not reverse a conviction so long as "the instructions, *taken as a whole*, adequately state the controlling law," *United States v. Wills*, 346 F.3d 476, 492 (4th Cir. 2003) (emphasis added). Because we find that the district court's instructions as a whole adequately articulated a criminal standard of proof, we find no error.

The potential for juries to confuse the civil standard of care applied in medical malpractice cases and the criminal standard of proof applied in § 841(a)(1) prosecutions requires courts to exercise care in setting out the governing standard in the latter circumstance.[10] We have previously considered the proper relationship between the standards in two decisions that are relevant to our analysis here, even though neither involved a direct challenge to the propriety of § 841(a)(1) jury instructions.

In *Tran Trong Cuong*, we addressed a sufficiency of the evidence challenge by Tran, a physician also indicted under § 841(a)(1). Tran's argument in part was that the district court erroneously applied a civil negligence, rather than a criminal, standard of proof during trial. 18

---

[10]In *Alerre* we pointed out that, "[i]n contrast to the criminal standard, a medical malpractice plaintiff in South Carolina must show in a civil case (1) 'the generally recognized practices and procedures that would be exercised by competent practitioners in a defendant doctor's field of medicine under the same or similar circumstances,' and (2) 'that the defendant doctor departed from the recognized and generally accepted standards, practices, and procedures.'" 430 F.3d at 690 (citing *Gooding v. St. Francis Xavier Hosp.*, 487 S.E.2d 596, 599 (S.C. 1997)).

F.3d at 1137. While acknowledging that the district court had, during trial, confused the two standards, we nevertheless concluded that the court's articulation of the criminal standard was correct when it instructed the jury at the close of the case. *Id.* at 1137-38. The trial court made it clear in its jury charge that the government must "prove beyond a reasonable doubt . . . that the defendant prescribed the drug other than for [a] legitimate medical purpose and not in the usual course of medical practice." *Id.* at 1137. It then recognized the broad discretion afforded doctors, instructed the jury to consider all of the defendant's actions, and provided specific examples of behavior that tended to denote illegitimacy, such as prescribing drugs without performing physical examinations, or asking patients about the amount or type of drugs they want. *Id.* at 1137-38. We held that these instructions adequately articulated the government's criminal burden of proof, and did not endorse the use of a negligence standard. *Id.* Indeed, we concluded that the jury instructions not only captured the criminal standard, but arguably imposed a higher burden on the government than set forth in *Moore* by additionally requiring proof that Tran had written prescriptions "without a legitimate medical purpose." *Id.*

In *Alerre*, in response to an argument that the entire trial was infected with an erroneous standard of proof, we approved instructions that largely mirrored those in *Tran Trong Cuong* but more fully developed "the distinction between the civil standard and the criminal standard." 430 F.3d at 691 n.9. The district court in *Alerre* distinguished civil standard-of-care evidence, explained the burden of proof necessary for a criminal conviction, and cautioned the jury that "the critical issue . . . was not whether the defendants had acted negligently, but whether or not [they] prescribed a controlled substance outside the bounds of their professional medical practice." *Id.* (quotations omitted).

Significantly, we recognized in *Alerre* that merely because standard-of-care evidence might show that a physician contravened the civil standard, it need not be categorically excluded from a criminal proceeding. *Id.* at 691. To the contrary, "evidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he was not acting as a healer but as a seller of wares." *Id.* Similarly, we recognized that evidence that a

physician "deviated drastically from accepted medical standards" is probative of criminal liability. *Id.*

With that guidance, we consider the challenge before us, which specifically focuses on the district court's jury instructions. The thrust of Appellant's argument is that the district court erred in telling the jury to consider the extent to which "any violation of professional norms you find to have been committed by the defendant interfered with his treatment of his patients and contributed to an over prescription and/or excessive dispensation of controlled substances." J.A. 1293. Appellant specifically focuses on the district court's use of the phrase "norms of professional practice." However, after reviewing the jury instructions *as a whole*, as we must, *Wills*, 346 F.3d at 492, we find multiple reasons to conclude that the instructions here properly set forth the criminal standard required by § 841(a)(1).

As was the case in *Tran Trong Cuong*, 18 F.3d at 1137, and *Alerre*, 430 F.3d at 687, the court below cabined both its overall § 841(a)(1) instruction, as well as its specific instructions on the third element, within the requirement of proof "beyond a reasonable doubt." J.A. 1290, 1292. This statement clearly articulated the proper criminal burden for the government and precluded conviction on a lesser civil standard of proof.

The court then properly defined the scope of unlawful conduct under § 841(a)(1) by explaining that the government had to prove that Appellant used "his authority to prescribe controlled substances . . . not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or" some other illegitimate purposes, such as his own "personal profit." J.A. 1292; *see Alerre*, 430 F.3d at 690-91. This instruction set the proper threshold for conviction by placing unlawful conduct beyond the bounds of any legitimate medical practice, including that which would constitute civil negligence. *See Tran Trong Cuong*, 18 F.3d at 1137; *cf. Alerre*, 430 F.3d at 690 (setting forth the standard for medical malpractice in South Carolina). In other words, the district court ensured that the jury could only convict Appellant for conduct that was exclusively criminal in nature.

Significantly, in order to satisfy this definition of unlawful conduct, the district court required the prosecution to prove, not only that

Appellant acted "outside the course of professional practice," as required by *Moore*, 423 U.S. at 124, but also that he acted "*for other than a legitimate medical purpose*," J.A. 1292 (emphasis added). This additional requirement arguably benefitted Appellant by placing an even heavier burden on the government than otherwise required to establish criminal liability. *See Alerre*, 430 F.3d at 690-91; *Tran Trong Cuong*, 18 F.3d at 1138.

As in *Tran Trong Cuong*, 18 F.3d at 1138, and *Alerre*, 430 F.3d at 691 n.9, the court next stated that so long as Appellant acted in good faith, he acted lawfully. J.A. 1291-92; *see* 430 F.3d at 692; 18 F.3d at 1138. The significance of this distinction is manifest: good faith is a defense to a charge under § 841(a)(1), but not to a claim of medical malpractice. *See Hurwitz*, 459 F.3d at 480 ("good faith generally is relevant in a § 841 case against a registered physician"); *Pleasants v. Alliance Corp.*, 209 W. Va. 39, 49 n.27 (2000) (collecting cases rejecting use of subjective good faith jury instructions in medical malpractice actions). The inclusion of a good faith instruction is therefore a plainspoken method of explaining to the jury a critical difference between the two standards.

Finally, the court instructed the jury on the difference between civil and criminal violations. J.A. 1293. The court indicated that "a violation of a professional norm does not in and of itself establish a violation of [a] criminal law," but could support a conviction based on its "extent and severity." *Id.* While this instruction allowed the jury to consider civil violations, it properly explained that such evidence is not inexorably indicative of unlawfulness. *See Alerre*, 430 F.3d at 691. The district court then concluded by describing the concept of medical malpractice and the civil standard of care before categorically stating that a criminal standard governed resolution of this case.[11] J.A. 1293-96 ("[Malpractice or negligence] is not what we're talking about

---

[11]While not directly relevant to the distinction between a civil and criminal standard of proof, we further note that the court here mirrored the instructions in both *Tran Trong Cuong*, 18 F.3d at 1137-38, and *Alerre*, 430 F.3d at 691 n.9, by instructing the jury to base its decision on all of Appellant's actions and the surrounding circumstances. J.A. 1291. Appellant thus received the benefit of court-sanctioned deference to his professional judgment.

. . . . We're talking about whether or not this physician prescribed a controlled substance outside the bounds of his professional medical practice.").

These instructions, taken as a whole, set the proper threshold for conviction, mandating application of a criminal standard of proof and precluding conviction on a lower civil standard. The fact that the district court may have invoked language, taken in isolation, suggestive of a civil standard, would not alone lower the government's burden of proof. Indeed, it would be difficult, if not impossible, to purge an instruction under § 841(a)(1) of all references to permissible standards or norms of care, since the third element of § 841(a)(1) requires a determination of whether the defendant's conduct is outside the usual course of professional conduct.

The jury instructions here went further in defining the proper criminal standard and distinguishing it from the civil standard than those which we approved, albeit in different contexts, in both *Tran Trong Cuong* and *Alerre*. We therefore find no error with the district court's instructions.

2.

Appellant further argues that Dr. Storick's testimony combined with the instructions on the third element to lower the government's burden. At trial, Dr. Storick opined that Appellant acted "outside the course of legitimate medical practice," "inappropriate[ly]" or "with no legitimate reason." J.A. 523, 527, 543. Appellant argues that the confluence of this testimony and the court's instructions regarding the "norms of professional practice" effectively allowed the jury to convict based on a civil standard of proof. We find this argument unpersuasive for two reasons.

First, as we recognized in *Alerre* and noted above, evidence regarding a departure from a generally recognized standard-of-care is not inherently impermissible. 430 F.3d at 691. To the contrary, such evidence may support an inference that a physician is acting as a dealer of drugs rather than a provider of care.[12] *Id.* Indeed, it is the extent and

---

[12]We entrust to the district court the task of ensuring that such evidence is sufficiently constrained as to not confuse a jury. *See* Fed. R.

severity of departures from the professional norms that underpin a jury's finding of criminal violations. *See id.* ("[E]vidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he was not acting as a healer but as a seller of wares.")

Second, even if we assume that Dr. Storick suggested a lower burden to the jury, the district court's jury charge negated any such testimony by articulating the proper standard. Again, our decision in *Tran Trong Cuong* is instructive. The district court there made statements at trial that unambiguously indicated that a civil standard of proof governed the case, commenting, for example, that the governing standard was (1) "whether a reasonably prudent physician would do it," (2) "whether it is within the standard of care of a family practitioner," and (3), "like you use in a civil case, whether [care was comparable to that provided] in the usual course of treating a patient by the average family practitioner." 18 F.3d at 1137. We concluded, nonetheless, that the satisfactory definition included in the jury instructions cured the prior misstatements. *Id.* at 1138. Such a conclusion is consistent with our general presumption that "a properly instructed jury [acts] in a manner consistent with the instructions." *Alerre*, 430 F.3d at 692; *see Jones v. United States*, 527 U.S. 373, 394 (1999) ("[J]urors are presumed to have followed . . . instructions.").

As discussed above, the district court here instructed the jury that the government had to satisfy a criminal standard of proof to convict Appellant. J.A. 1291-96. We presume that the jury followed these instructions and ignored any suggestion to the contrary. *See Jones*, 527 U.S. at 394; *Alerre*, 430 F.3d at 692. We discern nothing in the record that rebuts this presumption. Accordingly, we find no error.

## B.

Appellant next asserts error in the admission of Dr. Storick's expert testimony that Appellant treated certain patients outside the course of

---

Evid. 403 (requiring exclusion of confusing evidence); *Alerre*, 430 F.3d at 691 n.10 (noting that "undue emphasis on standard-of-care evidence might, in certain circumstances, confuse a jury."). Based on the record before us, we find nothing improper with the evidence admitted at trial.

legitimate medical practice. Appellant argues that this testimony embraced inadmissible legal conclusions. We review this argument for plain error because Appellant did not object to the testimony at trial. *United States v. Ellis*, 121 F.3d 908, 918 (4th Cir. 1997). To reverse on plain error review, we "must '(1) identify an error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Brewer*, 1 F.3d 1430, 1434 (4th Cir. 1993)) (alterations in original). Because we conclude that Dr. Storick's testimony was admissible, there was no error and Appellant cannot satisfy this standard.

Rule 704(a) allows the admission of expert testimony that "embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). In other words, questions of fact that are committed to resolution by the jury are the proper subject of opinion testimony. *Id.* However, opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.[13] *See United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002); *Okland Oil Co. v. Conoco, Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998). The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern. *Barile*, 286 F.3d at 760. We identify improper legal conclusions by determining whether "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Id.* For example, courts have held inadmissible testimony that a defendant's actions constituted "extortion," *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005); that a dog bite constituted "deadly force," *Miller v. Clark County*, 340 F.3d 959, 963 n.7 (9th Cir. 2003); that defendants held a "fiduciary" relationship to plaintiffs, *Christiansen v. Nat'l Sav. & Trust Co.*, 683 F.2d 530, 529 (D.C.

---

[13]We have previously recognized that in certain circumstances, such as cases involving specialized industries, "opinion testimony that arguably states a legal conclusion is helpful to the jury, and thus, admissible." *United States v. Barile*, 286 F.3d 749, 760 n.7 (4th Cir. 2002) (quoting Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2001)). Because we conclude that Dr. Storick's testimony did not embrace improper legal conclusions, we need not confront the question of whether his testimony falls under this exception.

Cir. 1982); and that a product was "unreasonably dangerous," *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981). Dr. Storick's testimony, however, does not involve terms with similar legal significance.

On the issue of whether Appellant acted "outside the bounds of his professional medical practice and for other than legitimate medical purposes," *Tran Trong Cuong*, 18 F.3d at 1137,[14] Dr. Storick opined that Appellant's treatment of certain patients was either illegitimate or inappropriate. J.A. 523, 527, 534, 541, 557-58. Although Dr. Storick used terms similar to that which this court has employed to express the underlying issue, none is sufficiently specialized to render his testimony inadmissible. Rather, the language Dr. Storick employed falls within the limited vernacular that is available to express whether a doctor acted outside the bounds of his professional practice.[15] We conclude therefore that the district court properly admitted Dr. Storick's testimony and that Appellant cannot establish plain error.

## C.

Appellant argues that the district court erred by excluding testimony from his expert witness, Dr. Thomas Duc. During direct examination, Appellant's attorney asked Dr. Duc whether a minority group of doctors who treat pain aggressively with opioids acted "within the bounds of medical practice." J.A. 1085. The government raised an objection to this testimony, which the district court sustained, on the

---

[14]This issue is a question of fact that is entrusted to the jury, *see Tran Trong Cuong*, 18 F.3d at 1137-38 (approving instructions given to jury on this issue); *United States v. Kaplan*, 895 F.2d 618, 623-24 (9th Cir. 1990) (treating issue as question for jury); *Oregon v. Ashcroft*, 192 F. Supp. 2d 1077, 1090 n.15 (D. Or. 2002) (recognizing issue as a question of fact for jury), and, therefore, is the proper subject of expert testimony, *see* Fed. R. Evid. 704(a).

[15]We note as well that experts in *Tran Trong Cuong* and *Alerre* testified similarly, and that the defendant in *Tran Trong Cuong* relied on the opinions of two physicians that his prescription practices were "within the state of the art" or "the medical standard." 430 F.3d at 686; 18 F.3d at 1135.

grounds that it called for a legal conclusion. *Id.* Even if the district court's exclusion of this testimony were improper, any such error was harmless because of the examination that followed. *See United States v. Pendergraph*, 388 F.3d 109, 112 (4th Cir. 2004) (recognizing that error in exclusion of evidence is harmless if it does not substantially sway the judgment).

After the district court sustained the government's objection, Appellant's attorney reworded his inquiry and conducted, without objection, a thorough examination of Dr. Duc's opinions on various approaches to pain management. J.A. 1085-88. This testimony was substantively identical to that sought from the initial question; it was merely elicited through an unobjectionable, if somewhat more cumbersome, line of questioning. Because of the similarity between the two lines of inquiry, we conclude that any error in the exclusion of the initial line of questioning did not sway the jury and, therefore, was harmless.

### D.

Finally, Appellant argues that there was insufficient evidence to support each of his convictions. A "jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it." *United States v. Wilson*, 198 F.3d 467, 470 (4th Cir. 1999). In making this determination, "we view the evidence in the light most favorable to the government and inquire whether there is evidence that a 'reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). We now turn to an analysis of each claim.

### 1.  Count 1, Conspiracy to Unlawfully Distribute a Controlled Substance

Appellant argues that the government did not present sufficient evidence on Count 1 to prove either that he entered into an illicit agreement with his patients to distribute controlled substances unlawfully or that he did so knowingly. Proof of each was a necessary element of the conspiracy charge against him. *United States v. Cropp*, 127 F.3d 354, 361 (4th Cir. 1997); *United States v. Clark*, 928 F.2d 639,

641-42 (4th Cir. 1991). There is ample evidence, however, to support each element.

With respect to the first element, "it is not necessary to prove a formal agreement to establish a conspiracy in violation of federal law; a tacit or mutual understanding among or between the parties will suffice." *United States v. Depew*, 932 F.3d 324, 326 (4th Cir. 1991). There was evidence that many of Appellant's patients were drug addicts who sought treatment from him with the express purpose of obtaining drugs and, further, that he prescribed drugs in quantities greater than he had reason to believe, or that tests revealed, his patients were using. *See* J.A. 134-35, 176, 248, 354, 356, 523, 527, 529, 533-34, 538-40, 543, 687. Viewed in a light most favorable to the government, this evidence supports a conclusion that McIver tacitly agreed with his patients to provide opioid prescriptions without legitimate medical reasons for doing so.

The government can satisfy the knowledge requirement by showing either that Appellant actually knew of the conspiracy, *Cropp*, 127 F.3d at 361, or that he was willfully blind to it by "purposely clos[ing] his eyes to avoid knowing what was taking place around him." *United States v. Ruhe*, 191 F.3d 376, 384 (4th Cir. 1999) (quoting *United States v. Schnabel*, 939 F.3d 197, 203 (4th Cir. 1991)). The government presented a plethora of evidence that demonstrates that Appellant either knew of the conspiracy, or, at the very least, was willfully blind to the unlawfulness of his actions.

Testimony showed that Appellant consistently prescribed large quantities of opioids despite warning signs that his patients were not using their medications as prescribed, were seeking his treatment specifically to obtain drugs, or were drug addicts. *See* J.A. 177-78, 180-82, 185, 207-08, 233, 250-51, 253, 350, 353, 359, 390, 392, 518-23, 530-31, 538, 542. Indeed, Appellant continued prescribing medication to one patient after she repeatedly told him that she could not take it, J.A. 356; to another after developing sufficient concern that the patient was selling his medication to contact state officials, J.A. 180-81; and to yet another after finding a syringe in his possession, J.A. 185. Evidence also revealed instances in which Appellant failed to conduct even the most basic diagnostic testing before prescribing opioids. *See* J.A. 184, 249. Taken together, this evidence supports

either of two alternate conclusions: that Appellant had actual knowledge that he was prescribing drugs for non-medical purposes or that he was willfully blind to his patient's true motives in seeking his care. Either circumstance establishes Appellant's knowledge of the conspiracy.

On this record, we conclude that the government presented sufficient evidence to satisfy both the agreement and knowledge elements of the conspiracy charge.

2.  Counts 3-5 & 13-15, Unlawful Distribution of a Controlled Substance

Appellant challenges the sufficiency of the evidence on the third element of the § 841(a)(1) charges, whether he prescribed substances "outside the usual course of professional practice."[16] *See Alerre*, 430 F.3d at 690 (quoting *Moore*, 423 U.S. at 124).

However, the evidence demonstrated that McIver freely distributed prescriptions for large amounts of controlled substances that are highly addictive, difficult to obtain, and sought after for nonmedical purposes. J.A. 134-35, 176, 180-83, 248, 251, 253, 255, 346, 354-56, 388-90, 518-23, 526, 529, 538-40. For one patient, he prescribed more than 20,000 pills in a single year. J.A. 687. He prescribed drugs to patients that he either knew or had reason to believe would not take them as directed. J.A. 354, 356. Some of his patients were drug addicts who sought treatment from him specifically to obtain controlled substances to use or to sell. J.A. 176, 248, 251, 253, 346, 356, 359. That Appellant knew or suspected his patients of drug abuse is reflected by the fact that he wrote to state authorities to express concern that his patients might be selling their medications. J.A. 126, 180-81. Appellant exercised minimal medical oversight of his patients' dosing practices. J.A. 184, 208, 249, 351, 416-17. He ignored evidence of the danger of prescribing drugs to certain patients, the drug-seeking behavior of others, and the drug abuse of still others. J.A. 177-78, 180-82, 185, 207-08, 233, 250-51, 253, 350, 353, 359, 390, 392, 518-23, 530-31, 538, 542. After several of Appel-

---

[16]Appellant does not contest the evidence as to either of the first two elements.

lant's patients stopped seeing him, they suffered significant drug withdrawal effects, at least in one instance requiring hospitalization. J.A. 211-12, 397. Dr. Storick testified at length about the extent to which Appellant's procedures went beyond the parameters of legitimate medical practice. J.A. 523, 527, 533, 542-43.

This evidence amply supports a finding that McIver's actions went beyond the legitimate practice of medicine and were "no different than [those of] a large-scale pusher," *Tran Trong Cuong*, 18 F.3d at 1138, and is thus sufficient to support each of McIver's § 841(a)(1) convictions.

    3.   Counts 11 & 12, Unlawful Distribution of a Controlled Substance Resulting in Death

In order to prove Counts 11 and 12, the government had to establish that McIver unlawfully distributed drugs to Shealy that resulted in his death. § 841(b)(1)(C). McIver argues only that the government did not present sufficient evidence to demonstrate that Shealy died from the drugs that he prescribed. Again, we disagree.

Both the pathologist who conducted Shealy's autopsy and the forensic toxicologist who examined his bodily fluids testified that Shealy died as a result of an oxycodone overdose. J.A. 419-20, 427-30, 456. The pathologist further testified that the amount of oxycodone in his system at the time of death was consistent with the amount prescribed by McIver. J.A. 427-30. This testimony is sufficient to support McIver's conviction on Counts 11 and 12.

III.

In light of the foregoing, each of McIver's convictions is

*AFFIRMED*.